### UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DALE A. KAYMARK, individually and on behalf of other similarly situated current and former homeowners in Pennsylvania,<br><br>       Plaintiffs,<br><br>     v.<br><br>BANK OF AMERICA, N.A. and UDREN LAW OFFICES, P.C.<br><br>       Defendants. | Civil Action #2:13-cv-00419-CRE |

### <u>PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS</u>

### TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 1

II.     STATEMENT OF FACTS ............................................................................. 4

III.    STANDARD OF REVIEW ............................................................................ 8

IV.     ALL COUNTS PLED WITH RESPECT TO BOA ARE VIABLE ............... 8

    A.  BREACH OF CONTRACT ......................................................................... 9

        i.      *The Pleading that Fees were Not Incurred Plausibly Gives Rise to an Entitlement for Relief* ........................................................... 10

        ii.     *Mr. Kaymark Sufficiently Pled Damages to Support a Breach of Contract Claim* ................................................................................. 13

    B.  FAIR CREDIT EXTENSION UNIFORMITY ACT ................................. 14

    C.  THE UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION LAW ................................... 18

        i.      *Justifiable Reliance is Not an Element of an UTPCPL, §201-2(4)(xxi) Claim* .................................................................... 19

        ii.     *Even if Justifiable Reliance is Required it has been Sufficiently Pled* ................. 23

        iii.    *Mr. Kaymark Sufficiently Pled an Ascertainable Loss* ......................................... 24

V.      ALL COUNTS PLED WITH RESPECT TO UDREN ARE VIABLE ......................... 27

    A.  FAIR DEBT COLLECTION PRACTICES ACT .......................................................... 28

        i.      *Attorneys' Fees Violate the Contract* .................................................................. 30

        ii.     *Fee Demands Were Material* ................................................................................ 33

        iii.    *Court Pleadings Can Serve as the Basis for an FDCPA Action* ........................... 34

        iv.     *Failure to Participate in the Debt Validation Procedure Does Not Constitute a Waiver of All Future FDCPA Rights* ................................................ 35

    B.  UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW ....................... 37

VI.     CONCLUSION ........................................................................................... 40

## TABLE OF AUTHORITIES

**Cases**

Ashcroft v. Iqbal, 556 U.S. 662 (2009)................................................................. passim

Bell Atlantic Corp., v. Twombly, 550 U.S. 544 (2007)................................. 8, 10, 14, 33

Benner v. Bank of Am., N.A., No. 11-6574, 2013 WL 85913 (E.D.Pa. Jan. 7, 2013)........... 17, 18

Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC, 40 A.3d 145 (Pa.Super. 2012) ........................................................................................ passim

Beyers v. Richmond, 937 A.2d 1082 (Pa. 2007) ............................................. 37, 38, 39

Brown v. Palisades Collection, LLC, 1:11-CV-00445-JMS, 2011 WL 2532909 (S.D. Ind. June 24, 2011)............................................................................. 36

Burns v. Pennsylvania Dep't of Correction, 544 F.3d 279 (3d Cir. 2008) ................. 25

Case of the State Tax on Foreign-Held Bonds, 82 U.S. 300 (1872)........................... 25

Chemtech Int'l, Inc. v. Chem. Injection Techs., Inc., 170 F. App'x 805 (3d Cir. 2006)............... 9

Com. ex rel. Corbett v. Manson, 903 A.2d 69 (Pa.Commw. 2006)........................... 22

Com. v. TAP Pharmaceutical Products, Inc., 36 A.3d 1197 (Pa.Commw. 2011) ...................... 22

Com., by Creamer v. Monumental Properties, Inc., 329 A.2d 812 (Pa. 1974)........................... 21

Commonwealth v. Percudani, 825 A.2d 743 (Pa.Commw. 2003)................................. 21

Cresci Const. Services, Inc., v. Martin, 64 A.3d 254 (Pa.Super. 2013)........................ 8

Daniels v. Davis Davis Attorneys, P.C., No. AR-10-006276, 2011 WL 601699 (C.P. Allegheny Feb. 18, 2011)............................................................... 1, 31, 34, 38

Delaware v. New York, 507 U.S. 490 (1993)............................................................ 25

Diaz v. Residence Credit Solutions Inc., No. 12-cv-3781, 2013 WL 1820948 (E.D.N.Y. April 29, 2013)................................................................. 36

Donohue v. Quick Collect, Inc., 592 F.3d 1027 (9th Cir. 2010) ................................. 34

Earnest v. Hoskins, 100 Pa. 551 (1882)....................................................................... 26

Ellis v. Solomon & Solomon, P.C., 591 F.3d 130 (2d Cir. 2010) ............................... 37

Gallagher v. Gurstel, Staloch & Chargo, P.A., 645 F.Supp.2d 795 (D. Minn. 2009) ............... 34

Glazer v. Chase Home Financial, LLC, 704 F.3d 453 (6th Cir. 2013).....................................27, 34

Glover v Udren, No. 08-990, 2010 WL 5829248 (W.D.Pa. Oct. 21, 2010)................................22

Glover v Udren, No. 938 WDA 2012 (Pa.Super. 2012) ...............................................................37

Grimes v. Enter. Leasing Co. of Phila., 66 A.3d 330 (Pa.Super. 2013) ............................... passim

Hahn v. Triumph Partnerships LLC, 557 F.3d 755 (7th Cir. 2009) ..............................................33

Heintz v. Jenkins, 514 U.S. 219 (1995) .................................................................................34, 35

Hunt v. U.S. Tobacco Co., 538 F.3d 217 (3d Cir. 2008) .............................................................22

In Re Smith, 866 F.2d 576 (3d Cir. 1989) ...................................................................................24

Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA, 559 U.S. 573 (2010)......................35

Kelter v. American Bankers' Fin. Co., 160 A. 127 (Pa. 1931)....................................................26

Manufacturers and Trades Trust Co. v. Luzerne County Tax Claim Bureau, 56 A.3d 36 (Pa.Commw. 2012) ..............................................................................................................25

Michaels Bldg. v. Ameritrust Co., N.A., 848 F.2d 674 (6th Cir. 1988) ......................................24

Owens v. Howe, 1:04-CV-152, 2004 WL 6070565 (N.D. Ind. Nov. 8, 2004)...........................32

Pennsylvania Dept. of Banking v. NCAS of Delaware, LLC, 995 A.2d 422 (Pa.Commw. 2010) ................................................................................................................22

Petro-Tech Inc. v. Western Co. of North America, 824 F.2d 1349 (3d Cir. 1987) .....................24

Piper v. Portnoff Law Assocs., Ltd., 396 F.3d 227 (3d Cir. 2005)....................................27, 34

Register v. Reiner, Reiner & Bendett, PC, 488 F. Supp. 2d 143 (D. Conn. 2007)......................37

Roethlein v. Portnoff Law Associates, Ltd., 25 A.3d 1274 (Pa.Commw. 2012) appeal pending, 53 A.3d 1317 (Pa. 2012) ........................................................................................4

Romea v. Heiberger & Associates, 163 F.3d 111 (2d Cir. 1998) .................................................16

Sayyed v. Wolpoff & Abramson, 485 F.3d 226 (4th Cir. 2007) ...............................................34

Stolicker v. Muller, Muller, Richmond, Harms, Myers and Sgroi, P.C., No. 1:04-CV-733, 2005 WL 2180481 (W.D.Mich. Sept. 9, 2005)..............................................................31

Trunzo v. Citi Mortgage, et al., No. 11-cv-01124, 2012 WL 2405257 (W.D.Pa. June 25, 2012) ................................................................................................................................22

<u>Velazquez v. NCO Fin. Sys., Inc.</u>, CIV.A. 2:11-CV-00263, 2011 WL 2135633 (E.D. Pa. May 31, 2011) .................................................................................................. 36

<u>Williams v. Nationwide Mut. Ins. Co.</u>, 750 A.2d 881 (Pa.Super. 2000) ....................... 9

<u>Yocca v. Pittsburgh Steelers Sports, Inc.</u>, 854 A.2d 425 (Pa. 2004) ........................... 22

**Statutes**

Act of Dec. 4, 1996, P.L. 906, No. 146, §1 (effective Feb. 2, 1997) ........................... 21

Fair Credit Extension Uniformity Act, 73 P.S. §2270.1, *et seq.* ........................... passim

Fair Debt Collection Practices Act, 15 U.S.C. §1692, *et seq*. ............................... passim

Housing Finance Agency Law, 35 P.S. §403, *et seq*. ........................................... passim

Loan Interest and Protection Law, 41 P.S. §401, *et. seq*. ..................................... 4, 30

Unfair Trade Practices and Consumer Protection Law, 73 P.S. §201-1, *et seq.* ................... passim

**Other Authorities**

38 Pa.B. 2560 ......................................................................................... 4

**Rules**

Fed.R.Civ.P. 12 ....................................................................................... 4

Pa.R.Civ.P. 1019(i) ................................................................................... 7

Pa.R.Civ.P. 1521 ..................................................................................... 32

And now comes the Plaintiff, Dale A. Kaymark ("Mr. Kaymark"), individually and on behalf of other similar situated former and current homeowners in Pennsylvania, and makes this his Response in Opposition to Defendants' Motions to Dismiss (see Documents 24-27).[1]

## I. **INTRODUCTION**

Economic misfortune had placed Mr. Kaymark in an unenviable position.  Unable to make his loan payments, he quickly became at risk of losing his home.  For homeowners in this and like situations, the ability to climb back can be balanced on a razors edge, with seemingly adversities able to push them over that edge.  The excessive fees charged here are just such adversities.  Given the precarious financial situation of a distressed homeowner, laws that prevent even minor overcharging provide indispensable protection and must be strictly enforced.

Unfortunately, the misfortune of some is frequently seen as a profit opportunity for others.  Desperate homeowners are poorly situated to win complex legal disputes with large financial firms and their attorneys, so the ability to monetize economic tragedy is, all too often, ineffectively limited by the letter of the law.  Rather, it has become common practice to run up dubiously foreclosure-related attorneys' fees.  See, e.g., Daniels v. Davis Davis Attorneys, P.C., No. AR-10-006276, 2011 WL 601699 (C.P. Allegheny Feb. 18, 2011) and cases cited therein. Most homeowners will not even contest the foreclosure let alone myriad questionable fees that attach themselves like barnacles to a sinking ship.  When the ship is going down, who has time to worry about the barnacles?  It is in this context that Mr. Kaymark's lender Bank of America ("BOA"), and its foreclosure attorney, the Udren Law Offices, P.C. ("Udren"), saw an opportunity to squeeze out more money; demanding more than necessary to clear the default while threatening to take action before legal action was even contractually or statutorily

---

[1] Under this Court's Chamber Rules, a response to a motion to dismiss is limited to twenty pages.  Mr. Kaymark is filing a combined response to both Defendants' Motions to Dismiss.  Therefore, this filing will consist of no more than forty pages.

authorized, and, when a failure to cure the deficiency resulted, charging for foreclosure-related attorneys' fees and costs that were not yet, and might never be, incurred for services performed. Mr. Kaymark brought this suit to challenge the legality of these practices under his loan contracts; the Fair Credit Extension Uniformity Act ("FCEUA"), 73 P.S. §2270.1, *et seq.*; the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. §201-1, *et seq.*; and, the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §1692, *et seq*.

The primary bases of Defendants' attack on the sufficiency of the counts in Mr. Kaymark's Amended Complaint are a few variations of the same four basic arguments.  With regard to all counts in the Amended Complaint, Defendants argue (a) that the foreclosure-related attorneys' fees and cost charges complained of were reasonable per se.  See Document 27, ps. 7-9.  This, allegedly obvious reasonableness, according to Defendants, fatally undermines the plausibility of Mr. Kaymark's contrary allegation that the Mortgage contract limitation to reasonable incurred fees for services performed was breached.  Defendants, thus, argue (b) that inflation of a lien against property, with corresponding decrease in equity, does not represent an ascertainable loss.  Document 25, ps. 21-23 and Document 27, ps. 14-16.  Fees were never paid in cash so there was never any sort of detrimental change in position that could support either breach of contract, FCEUA or UTPCPL causes of action.  Id. Defendants also argue (c) the absence of a voluntary payment in cash destroys Mr. Kaymark's ability to establish justifiable reliance (despite the effective payment made through the unjustified inflation of liens) defeating the UTPCPL count.  Document 25, ps. 10-23 and Document 27, ps. 16-19.  And Defendants also argue, variously, that (d) the Act 91 Notice, or the Foreclosure Complaint, both necessary to collect a debt through the foreclosure process, is not a communication connected to the

collection of debt capable of supporting either an FCEUA or FDCPA cause of action.  Document 25, ps. 11-17.

The defense that fees paid automatically through increased indebtedness and encumbrance is not a payment or loss of property is likewise meritless.  Increased indebtedness liened against a property restricts full enjoyment of the property.  It lessens the equity available and it makes sale more difficult.  Furthermore, there is nothing intangible about this.  If payment is made through property or cash, the change in net wealth is, dollar for dollar, the same.  There is nothing in the UTPCPL, the FCEUA, or the principles of contract law establishing the principle that diminution of property interest is not sufficient to state a damage claim.

As to the defense that Mr. Kaymark cannot establish the justifiable reliance necessary to state a claim under the UTPCPL, there is, according Pennsylvania appellate law, no such requirement under the amended version of the UTPCPL, §201-2(4)(xxi).   Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC, 40 A.3d 145 (Pa.Super. 2012) and Grimes v. Enter. Leasing Co. of Phila., 66 A.3d 330 (Pa.Super. 2013). As will be demonstrated below, the overwhelming consensus of the state appellate case law that has directly considered the effect of the 1996 amendment of the UTPCPL (extending coverage of the statute beyond fraudulent practices, to include deceptive practices) has determined that proving the elements of common law fraud is no longer required under the UTPCPL, §201-2(4)(xxi).

And even if there were such a requirement, justifiable reliance has, nevertheless, been sufficiently pled.  Where, as here, the accusation of fraud does not involve fraud in the inducement, but a fraud that attempts, post-transaction, to deprive a homeowner of the benefit of the bargain, the fact of payment is sufficient to establish reliance.  In any event, there is no need to reach this issue. The post-amendment case law that explicitly contemplates this issue has

overwhelmingly determined that common law pleading is no longer necessary under the amended UTPCPL, §201-2(4)(xxi).  See Bennett and Grimes.

Finally, the defense that either an Act 91 Notice, or a Foreclosure Complaint, is somehow outside of the ambit of the federal and Pennsylvania statutes regulating debt collection is inconsistent with statutes and case law.  The Act 91 notice procedure is a necessary step in the collection of a debt through foreclosure.  Act 91, §§403c and 403c.  Without said notice, no foreclosure action is possible, and the notice itself makes clear that a quite serious effort to collect a debt is underway.  That there is no private right of action under Act 91 is immaterial.[2] As long as an Act 91 notice is sent in connection with the collection of the debt, it is a communication implicating the FCEUA and (though not relevant here) the FDCPA.  With respect to the foreclosure complaints, the law is overwhelming that foreclosure and legal pleadings in connection with the collection of a debt is regulated by the FDCPA.

In short, none of Defendants' attacks on the legal sufficiency of the Complaint overcome the plausibility standard of Fed.R.Civ.P. 12.

## II.   STATEMENT OF FACTS

Plaintiff, Dale Kaymark, brought this action on his own behalf and on behalf of similarly situated homeowners.  See Document 23 (hereinafter "Amended Complaint").   In December 2006, Mr. Kaymark refinanced his home, located at 108 Economy Grade Road, Coraopolis Pennsylvania (the "home") to consolidate his debts.  Amended Complaint, ¶4.  To this end, he executed a Note for $245,600.00.  Id.   In consideration for the funds to

---

[2] The Act 91 notice, when relevant (based on the amount financed), incorporates the Loan Interest and Protection Law ("Act 6"), 41 P.S. §403.  See Act 91, §403c(b)(1).  Act 6, as interpreted by the Pennsylvania Housing Finance Agency, provides for thirty days actual notice to a homeowner, i.e., thirty days plus three days for mailing.  See 38 Pa.B. 2560.  Therefore, an Act 91 violation can constitute a violation of Act 6, which provides for a private right of action for Act 91 violations, including the violations alleged here.  See Act 6, §§501-502 ("otherwise by law").  See Roethlein v. Portnoff Law Associates, Ltd., 25 A.3d 1274 (Pa.Commw. 2012) appeal pending, 53 A.3d 1317 (Pa. 2012).  Contrast Document 27, ps. 11-13.

refinance, Mr. Kaymark granted a Mortgage to lender Bank of America, N.A.  Id.  Moreover, in the context of attorneys' fees and related costs, the Mortgage only permits the lender to collect "expenses incurred."  Amended Complaint, Exhibit C, ¶14.  These provisions are standard terms found in most, if not all, residential mortgages.[3]

In June 2011, because of lower customer demand for his truck driving services, Mr. Kaymark was financially unable to maintain his monthly mortgage payments.  Amended Complaint, ¶5.  Mr. Kaymark was unable to replace his lost income and catch-up on his arrearages.  Id., ¶6.

On or about August 1, 2011, BOA sent Mr. Kaymark a purported Act 91 Notice. Amended Complaint, Exhibit A.  Because that Notice did not satisfy the Act 91 mandates, it was only labeled an Act 91 notice but substantially it was not.  Under the terms of Act 91, §1680.403c, mortgage holders considering foreclosure are required to send homeowners a notice meeting specific statutory requirements as a prerequisite to commencing any legal action. These statutory notification requirements include, *inter alia*, that the homeowner receive an accurate, itemized breakdown of the total amount past due as of the date of the notice; that the homeowner be informed that (s)he is entitled to thirty-three days to have a face-to-face meeting with a consumer credit counseling agency; and that the homeowner be made aware (s)he can apply for financial assistance under the state-funded Homeowner's Emergency Mortgage Assistance Program ("HEMAP").  Act 91, §1680.403c(b)(1).

The Act 91 Notice that BOA sent Mr. Kaymark failed to satisfy the mandated Act 91 requirements in two important respects.  First, BOA's Act 91 Notice misrepresented the outstanding amount due and owing.  Amended Complaint, Exhibit A, p. 3.  A true Act 91

---

[3] The basic documents referenced in the Amended Complaint are the Act 91 Notice, the Foreclosure Complaint and the Mortgage (Exhibits A-C) incorporated at ¶¶7, 15 and 46.

notice must provide an accurate default amount due **as of the date of mailing**, to enable the homeowner to identify the default or delinquency.  Act 91, §403c(b)(1).  As of the date of mailing, Mr. Kaymark was two months in arrears on his Mortgage payments.  Amended Complaint, ¶11.  BOA's Notice, however, attempted to collect three months' worth of payments.  Amended Complaint, Exhibit A, p. 3.  In a clever bid to conceal the attempt to collect a month not in arrears, BOA indicated an amount due and owing of $4,599.98 for July 2011, in contrast to an amount due and owing of $2,306.94 for June 2011.  Id.  This attempt to collect an amount not due and owing violated several provisions of the FCEUA, and other laws discussed below, which broadly prohibits unfair or deceptive debt collection acts or practices by creditors.

Second, BOA's Notice misrepresented the amount of time Mr. Kaymark had to meet with a consumer credit counseling agency.  Amended Complaint, Exhibit A, p. 3.  BOA informed Mr. Kaymark that he had thirty (30) days to meet with a consumer credit counseling agency, as opposed to the thirty-three (33) days he was entitled to by the statute.  See Act 91, §1680.403c.  To add insult to injury, BOA also threatened to initiate legal action if Mr. Kaymark did not pay the inaccurate amount claimed to be owed within thirty (30) days.  Amended Complaint, Exhibit A, p. 3.  As noted, *supra*, no legal action may be initiated unless and until: (1) the mortgagee sends the homeowner a notice meeting the statutory requirements of Act 91; and, (2) at least thirty-three (33) days pass without the homeowner applying for financial assistance from HEMAP.  Act 91, §403(c)(b)(1).  Because BOA did not send Mr. Kaymark a Notice complying with the provisions of Act 91 and because a thirty-three day period was required, BOA's threat to initiate legal action after only thirty days could not lawfully be taken.  This threat constituted a separate violation of the FCEUA, §2270.4(b)(5)(v).

Perhaps the most serious economic injury occurred was on September 13, 2012, when BOA filed a Verified Foreclosure Complaint against Mr. Kaymark in Allegheny County, Pennsylvania through its attorney, Udren. See Amended Complaint, Exhibit B. BOA verified the Foreclosure Complaint on August 28, 2012. Id., at p. 19. The Foreclosure Complaint, ¶6, stated that as of the pre-foreclosure date of July 12, 2012, a total of $230,839.92, divided into several categories, was due and owing., including, *inter alia*, the complained about foreclosure fees and costs:

| | |
|---|---|
| **Title Report** | **$325.00** |
| **Attorney Fees** | **$1,650.00** |
| **Property Inspection** | **$75.00** |
| GRAND TOTAL | $230,839.92 |

It is averred that the foreclosure fees of $1,650.00 and the costs, as demanded, were not due or owning as of July 12, 2012. In addition, the Foreclosure Complaint failed to provide any loan contract documentation that the demanded fixed expenses and fees were authorized by any agreement between the parties or were incurred, despite the Rule that any such documents relied upon must be attached. See Pa.R.Civ.P. 1019(i). No such documentation exists. In addition, it is pled that BOA never incurred charges for the claimed professional services as of July 12, 2012. With respect to attorneys' fees, the Foreclosure Complaint demanded a fixed amount of $1,650.00, $325.00 for a title report, and $75.00 for a property inspection. Not only are these sums not alleged to reflect work Udren performed, but there is no indication that BOA ever paid them and, if it did, when. In accord with the terms of the loan contracts set forth above, only reasonable fees and costs, actually incurred. Amended Complaint, Exhibit C, ¶¶9(c), 14 and 22.

For these reasons, Mr. Kaymark's current account balance (payoff amount) was falsely inflated upon the filing of the Foreclosure Complaint. Currently, it reflects paid (or liened) and

unpaid foreclosure-related fees and legal expenses.  The lien wrongly caused a diminution in the value of Mr. Kaymark's property.   Mr. Kaymark has suffered deprivation of property equal to the charges improperly liened against, and encumbering, his property.

## III.    STANDARD OF REVIEW

The case law for the correct standard of review was cited by Defendants.  However, the standard of review relevant for motions to dismiss is frequently recited but just as frequently misapplied by defendant's eager to impose heightened pleading requirements.  The cases most frequently misused are Bell Atlantic Corp., v. Twombly, 550 U.S. 544 (2007) and Ashcroft v. Iqbal, 556 U.S. 662 (2009).   These cases impose a two part inquiry, first legal conclusions masquerading as facts must be identified and denied the presumption of truth.  Legal conclusions and legal conclusions alone are denied the presumption of truth.  Once the legal conclusions are quarantined the remaining factual conclusions must be given the presumption of truth.  At that point the remaining inquiry is reached as to whether, **if true,** these factual allegations plausibly give rise to an entitlement to relief. If they do, the count is viable.

## IV.    ALL COUNTS PLED WITH RESPECT TO BOA ARE VIABLE

The Mortgage contrast in this case authorized only incurred and reasonable foreclosure-related attorneys' fees and costs.  See  Mortgage, ¶¶ 9, 14 and 22.  Thus, only unliquidated amounts can be requested and, thus, can be awarded by a court.  BOA's Foreclosure Complaint demanded liquidated, fixed fees and costs.  See Amended Complaint, Exhibit B, p. 7.  Each of these fixed amounts were not authorized by the Mortgage.  See Cresci Const. Services, Inc., v. Martin, 64 A.3d 254 (Pa.Super. 2013).

### A.  Breach of Contract

As BOA asserts, to state a claim for breach of contract, Mr. Kaymark must plead "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages."  Williams v. Nationwide Mut. Ins. Co., 750 A.2d 881, 884 (Pa.Super. 2000); see also Chemtech Int'l, Inc. v. Chem. Injection Techs., Inc., 170 F. App'x 805, 807 (3d Cir. 2006).  This standard was met.

No one contests the existence of a contract between BOA and Mr. Kaymark, nor contests the fact that the contracts provide only for the collection of attorneys' fees (by the lender) for **"expenses incurred"** or **"services performed"** in connection with default.   Amended Complaint, Exhibit C, ¶14.  Mr. Kaymark clearly plead that a duty imposed by the Mortgage, namely the duty not to charge for attorneys' fees for services not performed or yet to be incurred, was breached by Defendants' attempt to collect legal fees that were not yet incurred.  Specifically, Mr. Kaymark alleged that legal and foreclosure fees, representing services allegedly performed by July 12, 2012 and totaling $2,050.00, were not incurred by the date indicated.  Amended Complaint, ¶18.  Finally, Mr. Kaymark plead that he suffered damages as a result of this breach, consisting in a diminution of his property corresponding to the increase of indebtedness, and increase in the value of the lien encumbering his property.

Though BOA does not address it, Mr. Kaymark also plead that the Act 91 Notice demanded fees that were not yet delinquent.  Amended Complaint, ¶11.  This attempt to demand sums not yet due and owing prior to acceleration breaches the terms of the Mortgage.  Also, Act 91 does not permit a lender to demand more than the amount owed to satisfy arrears to prevent

foreclosure, thus this was an attempt to overcharge or collect charges not authorized by law, and accordingly constitutes another breach of the Mortgage.[4]  Act 91, §403c(b)(1).

BOA attacks the sufficiency of the pleading on two grounds; that Mr. Kaymark failed to adequately allege that legal services were not performed and fees were not incurred; and that Mr. Kaymark failed to plead any damages as a result of the alleged breach.  Document 27, ps. 10-19. Neither attack withstands scrutiny.

> i.   *The Pleading that Fees were Not Incurred Plausibly Gives Rise to an Entitlement for Relief*

As to the insufficiency of Mr. Kaymark's allegation that the fees were unincurred, BOA alleges a couple of defenses.  Document 27, ps. 10-16 and 18-19.  From the outset, BOA erroneously states that this pleading (that the legal services were not performed and the fees were not incurred) is a "bald accusations and bare conclusion" not entitled to any weight under Iqbal/Twombly.  Document 27, p. 8.  This is a fundamental misreading of these cases.  In accord with the passages cited above, it is legal conclusions that are not entitled to the presumption of truth, not factual pleadings.  The allegation that "legal services justifying charges in the amount of $2050 were not performed, and the charges were not incurred by the lender, prior to July 13, 2012" is a pure factual allegation.  Document 27, p. 8.  As such, it is entitled to the presumption of truth unless (according to Iqbal/Twombly) it is facially implausible.  The "bald accusation and bare conclusion" prong of the Iqbal/Twombly inquiry is simply not applicable here.  The only

---

[4]While BOA ignores the implication of its excessive demand in the Act 91 Notice, it spends some time arguing that the difference in the payment allocation method stated in the Act 91 Notice from that established by the Mortgage contract does not state a viable breach of the Mortgage contract.  Document 27, ps. 6-7.  This discrepancy, however, does not comprise a part of Mr. Kaymark's breach of contract cause of action.  While it would be clearly a breach of the mortgage contract for BOA to actually use the allocation method set forth in the Act 91 Notice (e.g., the Act 91 Notice method gives priority to escrow deficiencies over late payments, in contravention of the terms of the Mortgage), Mr. Kaymark does not here assert that this method was actually used.  Rather this variance was cited as one of a number of the ways in which the Act 91 Notice was deceptive.  It described a method of payment allocation that would not actually be followed since it deviated from the terms of the Mortgage.  Accordingly, the variance between the contractual allocation method, and the method erroneously specified by the Act 91 Notice, goes to the FCEUA, FDCPA and UTPCPL counts, not breach of contract.

question is whether Mr. Kaymark's factual pleading (i.e., that the charges were never incurred) plausibly give rise to an entitlement to relief.

A factual pleading will give rise to an entitlement to relief if it is facially plausible, and its truth would "permit the court to infer more than the mere possibility of misconduct." See Iqbal, at 678. BOA does not dispute that this pleading would support an entitlement to relief if it were true, rather BOA attacks this "incurred charge" pleading as being facially implausible. However, to do this it largely relies on a straw man version of Mr. Kaymark's factual allegations. To be clear, Mr. Kaymark has alleged that: Prior to July 12, 2012, legal services were not performed and lender did not incur $2,050.00 in legal and foreclosure charges. Amended Complaint, ¶¶16 and 31. This says nothing about what may have happened subsequent to this date. The pleading simply asserts that the legal fees were not incurred prior to July 13, 2012, which was a full sixty days prior to even the filing of the Foreclosure Complaint.

BOA attempts to undermine this allegation by citing alleged work later preformed and suggesting that, given this work, the charges were reasonable as a matter of law. Of course it is not possible to know without access to the billing records whether this cited work would justify said charges, but more importantly, all the work cited by BOA was performed long after July 13, 2012, and is irrelevant to what charges were incurred by July 12, 2012. Amended Complaint, ¶¶ 16 and 31.

BOA also attempts to demonstrate that the foreclosure-related attorneys' fees and costs were reasonable by citing the FNMA fee schedule, which in a remarkable coincidence is exactly the amount charged to Mr. Kaymark (along with another $375.00 in sundry fees). Document 27, p. 9 fn. 2. But what the FNMA schedule establishes is the **maximum** amount that can be charged for foreclosure fees, not the fees that can be charged to file a foreclosure complaint, or to

do whatever else BOA can be plausibly claimed as done **a full two months before the foreclosure was even filed**.  According to BOA and its Foreclosure Complaint, their attorney (co-Defendant Udren) had already reached its FNMA maximum sixty days prior to the start of litigation.  Nonetheless, it is certainly plausible that this industry, standard maximum (no relevant to Mr. Kaymark's Mortgage) was not reached sixty days prior to the commencement of the action, or even at the commencement of the action.

The most likely explanation for the charges levied by Udren is that it was a fixed fee.  That is a fee that does not represent services performed or fees actually incurred, but only a speculation of what fees may be needed **on average** once the whole process is complete.  This may or may not represent a reasonable amount when all things are said and done.  But what it clearly does not represent, at least if the fee is charged, as here, at the commencement of proceedings, is a correct debt demand for services actually incurred. Such fees could be agreed to by the contracting parties as a species of liquidated damages, but this was not done here.  BOA claims that there is no explicit bar on fixed fees in the loan contracts, and this is not correct.  But what the contract does provide for (fees incurred for services performed) is completely inconsistent with fixed fees that will only match up with an actual accounting by sheer coincidence.  As such, it was, under the Mortgage, a breach for BOA to attempt to collect on a fixed-fee calculation.

In the final analysis, at this stage, Mr. Kaymark only needs to establish facts that give rise to a plausible entitlement to relief.  Mr. Kaymark has asserted that charges for legal fees on the Foreclosure Complaint were not incurred (and that the services were not performed) by July 12, 2012, which was sixty days prior to the commencement of the action.  There is nothing implausible here.  In fact, given the likely fixed fee structure, it is overwhelmingly likely that the

legal services were not yet performed.  This is the way fixed fees work.  Given the plausibility of Mr. Kaymark's factual pleading, it is entitled to a presumption of truth.  And if it is true, and other elements are satisfied, it would clearly entitle Mr. Kaymark to relief, since un-incurred fees, or fees for services not performed, are prohibited by the Mortgage.

> ii.   *Mr. Kaymark Sufficiently Pled Damages to Support a Breach of Contract Claim*

BOA also attacks the sufficiency of Mr. Kaymark's pleading of the third and final contract elements, including damages, but ignores the actual content of the pleading.  Instead, it focuses on the absence of a cash payment.  Document 27, p. 10.  But cash payment is not the basis of Mr. Kaymark's allegation of damages.   Rather, Mr. Kaymark based his claim for damages on the increase in indebtedness and corresponding encumbrance on his property that resulted from the unjustified and illegal charges.

BOA defends that any breach of contract claim pled by Mr. Kaymark is foreclosed by the fact that no fees were actually paid, leaving Mr. Kaymark unable to satisfy the contractual damages element.  This defense is flawed because Mr. Kaymark explicitly pled that he was damaged by BOA's breach of contract through the increase of his unpaid principal balance and the resultant inflation of the lien on his home.  Amended Complaint, ¶¶19 and 43.  As with Mr. Kaymark's other claims, BOA overstates the level of pleading required to allege damages, and fails to recognize that there are clearly cognizable damages attendant to the institution of the contractually unauthorized and statutorily illegal foreclosure-related fees and charges identified in the Foreclosure Complaint; damages consisting in diminution of Mr. Kaymark's property interest by a lien (along with a corresponding enhancement in the economic position of BOA) in violation of the Mortgage.

As to whether Mr. Kaymark adequately pled that he was damaged by BOA's breach of contract, Twombly and Iqbal require that a plaintiff plead facts that plausibly give rise to an entitlement to relief.  Under a contractual damages perspective, these cases require only that a plaintiff plead a negative change in economic position.  Mr. Kaymark pled that the illegal charges were made part of the Mortgage debt, and increased the amount of the lien on his underlying property.  Amended Complaint, ¶¶19 and 43.  This increase in the amount of money required to unencumber the property is a distinct and easily quantifiable reduction in property interest no different in its net effect than if the amount added to the lien was paid in cash by Mr. Kaymark.  As such, through the increase in the encumbrance on property, Mr. Kaymark suffered quantifiable damages.  The increase in the value of the lien directly enhanced BOA's position by an amount equal in magnitude to the property loss suffered by Mr. Kaymark. As Mr. Kaymark pled the circumstances under which this automatic derogation of property interest occurred, Mr. Kaymark has sufficiently pled the requisite damages element for his Mortgage claim.  Amended Complaint, ¶¶44-48.

### B.  Fair Credit Extension Uniformity Act

The FCEUA prohibits creditors from using "any false, deceptive or misleading representation or means in connection with the collection of any debt," [FCEUA, §2270.4(b)(5)] or any "unfair or unconscionable means to collect or attempt to collect any debt," [FCEUA, §2270.4(b)(6)].  BOA's actions violated both of these provisions in several respects, which were pled with specificity in the Amended Complaint.

1.  BOA's Act 91 Notice described a method of allocating delinquent payments that were inconsistent with the terms of the mortgage and thereby misrepresented the actual way payments must be applied.

2.  BOA's Act 91 Notice threatened legal action if Mr. Kaymark did not cure his default within thirty (30) days, as opposed to the thirty-three (33) days to which he was statutorily entitled.  Amended Complaint, Exhibit A, p. 1-3.  This threat to take action that could not legally be taken both violated the FCEUA, §2270.4(b)(5)(v), and constituted a "false representation or deceptive means to attempt to collect a debt" in violation of the FCEUA, §2270.4(b)(5)(x).

3.  The Act 91 Notice that BOA sent to Mr. Kaymark was misleading and demanded an amount beyond that required to cure the default, thereby misleading Mr. Kaymark on the amount required to bring the loan current.  Such an attempt constitutes a false representation of the character, amount, or legal status of a debt in violation of the FCEUA, §2270.4(b)(5)(ii), as well as a false representation or deceptive means to attempt to collect a debt in violation of the FCEUA, §2270.4(b)(5)(x).

4.  The Foreclosure Complaint filed against Mr. Kaymark sought attorneys' fees and costs for services that were not performed or had yet to be incurred.  Such fees are not authorized by the loan contracts governing the debt at issue.  These foreclosure fees and costs were charged against Mr. Kaymark's account and liened against his property before such charges were incurred.

BOA attacks the legal sufficiency of this pleading for two reasons.  First, BOA seems to be arguing that the absence of a private right of action under Act 91, and the fact that Act 91 notices serve functions in addition to debt collection, create a sort of wall of FCEUA immunity around the contents of an Act 91 notice.  An Act 91 notice is entitled to no such immunity.

Mr. Kaymark is not attempting to enforce Act 91.  He is, however, entitled to enforce Act 91 through Act 6, §502 under the "otherwise by law" rubric.  In any event, the cause of action does not originate from the violation of Act 91, but from the fact that the specific Act 91

violations complained of also implicate the FCEUA.  The FCEUA addresses false, misleading or deceptive communications made in connection with the collection of any debt.  If an Act 91 notice is false, misleading or deceptive with respect to the underlying debt, and is sent in connection with the collection of that debt, then it is a false, misleading or deceptive communications made in connection with the collection of a debt, and accordingly is prohibited by the FCEUA.

Mr. Kaymark has pled that the Act 91 Notice was false, misleading and deceptive concerning the underlying debt in the ways enumerated above.   All that remains to be determined, then, is whether an Act 91 notice is sent in connection with the collection of a debt. BOA's defense, therefore, is without merit.  While BOA is eager to portray an Act 91 notice as merely a means for informing distressed homeowners about programs that might provide funding to prevent default, it neglects to discuss the crucial role that Act 91 notice plays in the debt collection process.   The Act 91 notice is an absolute precondition in enforcing a mortgage. Without proper Act 91 notice, no foreclosure action can be even be brought:

> (a) Before any mortgagee may accelerate the maturity of any mortgage obligation covered under this article, commence any legal action including mortgage foreclosure to recover under such obligation, or take possession of any security of the mortgage debtor for such mortgage obligation, such mortgagee shall give the mortgagor notice as described in section 403-C.

Act 91, §1680.402c.  A communication sent as a necessary prerequisite to judicial collection is a communication sent in connection with the collection of a debt.   Romea v. Heiberger & Associates, 163 F.3d 111, 116 (2d Cir. 1998).

Furthermore the content required by an Act 91 notice, which includes a detailed accounting of the amount needed to cure default, a time frame in which action must be taken, and a warning of the consequences that failure to act might imply, further negates the notion that

the lender has taken of its debt collecting hat and put on it friendly "let's provide beneficial information to the homeowner" hat.   On the contrary, a lender sends out an Act 91 notice because it has become deadly serious about collecting the debt; serious enough to put someone out on the street.  Anybody that receives an Act 91 notice is subject to a debt collection attempt.

BOA relies heavily on Benner v. Bank of Am., N.A., No. 11-6574, 2013 WL 85913, *18 (E.D.Pa. Jan. 7, 2013) for the proposition that Act 91 violations are not subject to FCEUA remedies.   Benner says no such thing and instead acknowledges that an Act 91 notice violation can implicate the FCEUA or FDCPA "While both statutes are often implicated in the debt collection process, not every inaccurate statement made during that process is actionable under the FDCPA".   Id.   What Benner actually held is that whether an Act 91 violation implicates the debt collection statute depends on whether the alleged error goes to debt collection or information on securing assistance:

> These representations—regardless of their accuracy—do not relate to Defendant's attempt to collect the outstanding mortgage debt. Rather, the statements provided Plaintiff with information about a state-run program designed to help him with his difficult financial situation. Defendant's statements did not mischaracterize the legal status of his mortgage debt, nor did the statements misrepresent how much he owed or Defendant's legal right to collect the debt.

Id.   While this distinction drawn by the court is questionable (as discussed below), it is implied that the Bennett is not absolving all Act 91 violations, only those that do not go toward the collection of the debt.  Mr. Kaymark has pled several Act 91 violations that go to collection of the debt, the demand for payment above and beyond that required to cure the default, and the threat to apply an extra contractual payment allocation.  These are clear violations even under Benner since they go directly to collection (and since they are false, misleading and/or deceptive).

While three of Mr. Kaymark's FCEUA pled violations are viable even under <u>Benner</u>, the 30/33 day discrepancy was determined by <u>Benner</u> to not state a claim.  The <u>Benner</u> decision is that of one District Court and does not represent binding authority.  Advising someone that they have thirty days, as opposed to thirty-three days to take action to postpone a foreclosure is a direct violation the time allotted by statute.  It is difficult to understand how falsely advising a homeowner about a key time period can be unconnected to the debt collection process.  It also mischaracterizes the legal status of the debt (i.e., that the debt is subject to foreclosure in thirty days, as opposed to thirty-thee).  Respectfully, <u>Benner</u> should not be followed by this Court.

Because Mr. Kaymark has adequately pled that BOA's Act 91 Notice, and Foreclosure Complaint contained false, misleading and deceptive elements, and because both communication were in connection with an attempt to collect a debt, Mr. Kaymark has adequately pled FCEUA violations against BOA, and, respectfully, Count I should not be dismissed.  Ascertainable loss is not a defense under the FCEUA but is a defense under the UTPCPL.

### C.  The Unfair Trade Practice and Consumer Protection Law

The UTPCPL provides consumers protection against unfair or deceptive conduct.  This protection is quite broad and includes a blanket prohibition against "engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." UTPCPL, §201-2.

BOA violated the UTPCPL by overcharging homeowners for foreclosure-related attorneys' fees and costs, thereby misrepresenting the amount that they actually owed.  The Defendants charged Homeowners for attorneys' fees and costs that were not authorized by their mortgages.  These actions violated the above-cited portions of the UTPCPL, §201-2(4), by

"engaging in… fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."

In addition, BOA misrepresented how it could allocate homeowners' monthly payments in its Act 91 Notice while misrepresenting the actual terms of its mortgages.

Homeowners suffered an ascertainable loss of property when the unauthorized charges were liened against their homes, thereby decreasing their equity in their property.  The fact of the homeowners' payments, in part for the unauthorized charges added to their debt, established reliance on Defendants' overcharges and misrepresentations.

BOA advances two separate defenses attacking the sufficiency of Mr. Kaymark's pleading under UTPCPL, §201-2(4)(xxi), that Mr. Kaymark fails to plead justifiable reliance, and that Mr. Kaymark fails to plead an ascertainable loss.  Neither defense bares scrutiny.

> *i.   Justifiable Reliance is Not an Element of an UTPCPL, §201-2(4)(xxi) Claim*

BOA cites case law purporting to demonstrate the requirement of a showing of justifiable reliance to state a claim under the UTPCPL.  Document 27, ps. 14 and 16-19.  However, the case law cited is premised on case law analyzing the pre-amended version of the UTPCPL statute.  Recent case law in both the federal courts and Pennsylvania Superior Court demonstrates that under the amended UTPCPL there is no longer a requirement for a justifiable reliance defense.  See UTPCPL, §201-2(4)(xxi).

BOA acknowledges this recent case law, but buries its acknowledgement in a footnote that fails to capture the significance of the carefully reasoned shift of the Pennsylvania Legislature that has recently occurred with respect to UTPCPL, §201-2(4)(xxi).  Document 27, p. 17.  BOA cites Grimes, 66 A.3d 330, indicating that the court there had given mixed and confused signals, requiring reliance in one passage and then "suggesting" a different result for UTPCPL, §201-2(4)(xxi) in a footnote.  What the Grimes court actually held was:

> The trial court also noted that "[Grimes] can[not] establish justifiable reliance" in furtherance of her UTPCPL claim. Grimes' claim under the catchall provision of the UTPCPL alleges that Enterprise's conduct was both fraudulent and deceptive. *See* Grimes' Complaint, 6/20/11, at ¶¶ 51, 54–56, 58–61. As this Court recently held in *Bennett,* when a plaintiff alleges a claim under the UTPCPL catchall provision under the theory of deceptive conduct, the plaintiff need not prove the elements of common law fraud, including "induc[ment of] justifiable reliance...." *Bennett, supra* at 152 n. 5, 154–155. Therefore, to the extent that Grimes alleges Enterprise's conduct was deceptive, as opposed to fraudulent, she need not allege justifiable reliance.

Grimes, 337 fn. 4.  This is not an example of a court contradicting itself, but of a court establishing a distinction between different versions of the UTPCPL.  The Grimes court was not making a mere suggestion, but issuing a holding based on Bennett, supra.  Oddly BOA does not cite or discuss Bennett, a case that exhaustively analyses the existence of a requirement to plead elements of common law fraud, including justifiable reliance, with respect to the **amended UTPCPL.**

When the UTPCPL was amended in 1996, the Legislature added language prohibiting deceptive as well as fraudulent conduct to the UTPCPL, §201-2(4)(xxi). The question arose whether an allegation of deceptive conduct must be supported with a showing of all the elements of common law fraud.  The Bennett court, after extensive analysis, concluded that the inclusion of deceptive alongside fraudulent implied that the Legislature intended to capture behavior not encompassed by fraud, otherwise the deceptive language would be redundant.  Accordingly the court found that, as deceptive must be different from fraudulent; there is no reason to believe that elements of fraud must all be pled.

The Bennett court, after extensive analysis found the following.  The purpose of the UTPCPL is to protect the public from unfair or deceptive business practices, and the Supreme Court "has stated courts should liberally construe the UTPCPL in order to affect the legislative

goal of consumer protection."  <u>Id.</u>, at 151; citing <u>Com., by Creamer v. Monumental Properties,</u> <u>Inc.</u>, 329 A.2d 812, 816 (Pa. 1974).  In 1996, the legislature amended the old catchall provision of the UTPCPL, adding language prohibiting deceptive conduct to the provision which had previously only reached fraudulent conduct. <u>See</u> Act of Dec. 4, 1996, P.L. 906, No. 146, §1 (effective Feb. 2, 1997).  The current catchall provision proscribes "fraudulent **or deceptive conduct** which creates a likelihood of confusion or of misunderstanding" (emphasis added). UTPCPL, §201–2(4)(xxi).  <u>Bennett</u>, at 151-152.

Despite this amendment, including deception and widening the scope of the provision beyond fraud, the Superior Court continued to rely on the now inapplicable pre-amendment case law (an error according to <u>Bennett</u> and <u>Grimes</u>) in determining whether common law fraud pleading was required under UTPCPL, §201–2(4)(xxi).

> After the UTPCPL was amended, however, this Court continued to refer to case law citing the pre-amendment version that required a plaintiff to prove common law fraud to recover under the UTPCPL catchall provision. ... Despite the addition of language regarding deceptive conduct, the post-amendment cases do not discuss the 1996 amendment in any detail, or consider what effect it might have on the catchall provision.

<u>Bennett</u>, at 152.  In contrast to the Superior Court cases, the Commonwealth Court, beginning with <u>Commonwealth v. Percudani</u>, 825 A.2d 743, 746–747 (Pa.Commw. 2003), developed a straight line of cases that explicitly dealt with the construction of the statute as amended.

> *Percudani* examined both the text and legislative history of Section 201–2(4)(xxi) before holding the 1996 addition of "deceptive conduct" changed the standard for the catchall provision. *Id.* at 747. In light of the legislative changes, *Percudani* concluded any decision to retain the pre–1996 pleading standards for Section 201–2(4)(xxi) would render the words "deceptive conduct" superfluous and run contrary both to the rules of statutory construction and our Supreme Court's directive for liberal construction of the UTPCPL. *Id.*

Bennett, at 152-153.  Also see Com. ex rel. Corbett v. Manson, 903 A.2d 69, 74 (Pa.Commw. 2006); Com. v. TAP Pharmaceutical Products, Inc., 36 A.3d 1197 (Pa.Commw. 2011); Pennsylvania Dept. of Banking v. NCAS of Delaware, LLC, 995 A.2d 422, 433 fn. 28 (Pa.Commw. 2010).

The Bennett court also recognized that the Pennsylvania federal courts **that have acknowledged the amendment of the statute** have largely sided with the Commonwealth Court and found no requirement to plead common law fraud under the "deceptive" prong of UTPCPL, §201-2(4)(xxi).  Bennett at 153 (citing various case law).

Two separate courts in this district alone have reached this identical conclusion.  See Glover v Udren, No. 08-990, 2010 WL 5829248 (W.D.Pa. Oct. 21, 2010).  Also see Trunzo v. Citi Mortgage, et al., No. 11-cv-01124, 2012 WL 2405257, *29 (W.D.Pa. June 25, 2012) citing Bennett.

After citing a couple of contrary examples the Bennett court highlights that the federal courts have typically declined to follow the Superior Court cases because they relied on pre-amendment case law.  Bennett at 153-154 and fn. 6.

This is starkly to the contrary of the analysis performed in Hunt and cited by BOA.  It should be noted that, of the cases analyzed in Hunt v. U.S. Tobacco Co., 538 F.3d 217 (3d Cir. 2008), relies on Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425 (Pa. 2004), wherein the complaint pled a post-amended UTPCPL, §201-2(4)(xxi) cause of action.  But in ruling, the Supreme Court simply does not discuss the amended language in UTPCPL, §201-2(4)(xxi)., or for that matter even the existence of UTPCPL, §201-2(4)(xxi).  The word deceptive does not appear in the opinion and it is unclear whether the deception issue with respect to UTPCPL, §201-2(4)(xxi) was even raised.  In short, the analysis in Hunt is pretty weak tea as regards the

proper construction of post-amendment of UTPCPL, §201-2(4)(xxi). The more thorough analysis in <u>Bennett</u>, which is careful to rely on only case law accounting for the 1996 amendment, provides the most authoritative interpretation of how the Pennsylvania Supreme Court would rule if properly presented with the issue.

When the intent of the Legislature in extending the scope of the UTPCPL beyond fraud is considered, the requirement for fraud pleading simply cannot stand.  Accordingly, there is no requirement for Mr. Kaymark to plead the elements of common law fraud, and therefore no requirement to plead justifiable reliance.  All that is required is an allegation of deceptive conduct likely to confuse or cause misunderstanding, and an allegation of an ascertainable loss. BOA's attempts, in the Act 91 Notice, to demand excessive foreclosure-related attorneys' fees and costs to cure default, to threaten legal action after only thirty days when by state law it could only commence action after thirty-three days, and its misdirection as to the allocation of payments, all satisfy this first element, as does its imposition of contractually unsupported fees in its Foreclosure Complaint.

> ii.  *Even if Justifiable Reliance is Required it has been Sufficiently Pled*

Even if there remains some sort of requirement to plead reliance to satisfy UTPCPL, §201-2(4)(xxi), this requirement is satisfied here.  This case does not involve fraud in the inducement but post contractual fraud.  The fraud was not perpetrated to induce Mr. Kaymark to enter into a transaction but to deny Mr. Kaymark the benefit of the Mortgage contract he had already entered into.  In addition, the fact of payment of cash or property is sufficient to establish reliance because there is no other reason that a particular payment would have been made other that plaintiff relied on the representations of the counter-party to honor its contract.[5]

---

[5] In fraudulent inducement cases, there may be a heavy focus on individual reliance issues.  In contrast, where fraud occurs after a buyer and seller have already contracted, the deception operates to deprive the counterparty of their

Accordingly, if this were a case where cash payments had been made in response to the representations of the lender or foreclosing attorneys, the fact of payment would be clearly sufficient to establish justifiable reliance.  The only wrinkle here is that payment was in the form of increased encumbrance on property as opposed to cash.  But this makes no difference because the net result is the same: a detrimental change in position experienced by the homeowner (coupled to a corresponding beneficial change of position enjoyed by the lender).  The fact that the payment was automatic and non-volitional does not excuse the lender.  In fact it would be perverse if it did. It would be impossible for a lender to be held accountable for fraud if phony charges were simply added to a homeowners indebtedness surreptitiously unless the homeowner acquiesced by actually paying the charges, but a homeowner that pays hundreds of dollars out of pocket to clear bogus charges is just as damaged as a borrower that see hundreds of dollars knocked off of the equity in his house, and the lender that imposes the charges in secret is arguably worse since it can better evade detection.  Giving lenders free rein to increase the portfolio of their receivables (which is an asset that a bank can directly monetize) cannot be squared with the purpose of the UTPCPL or the command to construe its provisions liberally to effectuate it goals.  Bennett and Grimes.  Also see In Re Smith, 866 F.2d 576 (3d Cir. 1989).

     *iii.*     *Mr. Kaymark Sufficiently Pled an Ascertainable Loss*

As to the final element, the pleading of an ascertainable loss, BOA's defenses are equally unavailing.  Mr. Kaymark has pled that he suffered an ascertainable loss when BOA's deceptive fees were added to his principle balance, reducing his equity in the property and increasing the encumbrance upon it.

---

contracted-for benefits.  Where it occurs, it may occur automatically, as here.  To the extent that reliance is an element in post-contract deception cases, it is on the integrity of the opposing contracting party to fulfill its contractual commitments. See Michaels Bldg. v. Ameritrust Co., N.A., 848 F.2d 674, 679, n. 8 (6th Cir. 1988). There, the court addressed this post-contractual type of fraud class action holding that payment equals reliance. Also see Petro-Tech Inc. v. Western Co. of North America, 824 F.2d 1349 (3d Cir. 1987).

An increase in debt and encumbrance constitutes a detrimental change in position for the debtor and a property interest of the creditor. Manufacturers and Trades Trust Co. v. Luzerne County Tax Claim Bureau, 56 A.3d 36 (Pa.Commw. 2012) (a lien on property is a property interest of the creditor).   The pled damages consist in diminution of Mr. Kaymark's property interest by a lien, along with a corresponding enhancement in the position of BOA.  See, e.g., Delaware v. New York, 507 U.S. 490, 499 (1993) ("the property interest in any debt belongs to the creditor"); Case of the State Tax on Foreign-Held Bonds, 82 U.S. 300, 320 (1872) ("[D]ebts owing by corporations, like debts owing by individuals, are not property of the debtors in any sense; they are obligations of the debtors, and only possess value in the hands of the creditors. With them they are property, and in their hands they may be taxed. To call debts property of the debtors is simply to misuse terms."); Burns v. Pennsylvania Dep't of Correction, 544 F.3d 279, 286-287, 289-290 (3d Cir. 2008) (threat of seizure of property was a property interest implicating due process, and noted that "the most basic of economic principles teaches that property subject to seizure-even if the probability and timing of such a seizure is unknown-possesses a lesser present day economic value than property not so encumbered" and that "[i]n the context of real property, a simple example of the relationship between an asset's value or utility and the threat of expropriation can be seen in the divergent market values of an estate held in fee simple versus an estate held subject to an encumbrance").

The UTPCPL provides remedies to address deceptive or fraudulent practices resulting in an ascertainable loss. UTPCPL, §201-9.2.  The existence of a loss is determined by substance, not labels.   An overcharge or overpayment need not consist of money, but can consist of property.  Just as excess interest can constitute an overcharge, an excessive unjustified lien can also constitute an overcharge.  The Pennsylvania Supreme Court has recognized that transferred

property can constitute an overcharge or usury.  See, e.g., Kelter v. American Bankers' Fin. Co., 160 A. 127, 131 (Pa. 1931) (construction contract assignment); Earnest v. Hoskins, 100 Pa. 551, 553 (1882) (land purchase at exorbitant prices).

If a property loss is sufficient to establish an overpayment or detrimental change in position in other contexts established by Pennsylvania law, it should be sufficient in the context of the UTPCPL, particularly in light of the Supreme Court's admonition to construe the provisions of the UTPCPL liberally.  There is no reason to believe that detrimental change in position attendant to a property loss is any less ascertainable in the UTPCPL context than it is in the myriad other contexts in which allegation of a loss of property is sufficient to satisfy a damages element.  Such a detrimental change in position, resulting from property loss, is easily quantified and is not categorically different from a detrimental change in position resulting from a cash payment.  Just as a dollar taken out of a wallet results in a dollar loss, a dollar added to a debt results in precisely the same diminishment of net wealth.  A dollar loss is a dollar loss, whether the loss is in net wealth, property or cash.

A construction of the UTPCPL that took no cognizance of property loss would be an unduly restrictive application of the ascertainable loss element of a UTPCPL claim. Indeed, the UTPCPL includes a specific remedy provision addressing loss of property only:

> Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any **ascertainable loss of money or property**, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action… (Emphasis added)

UTPCPL, §201-9.2(a).  Also see Bennett, at 151 (observing that "[t]he UTPCPL provides a private right of action for anyone who 'suffers any ascertainable loss of money or property' as a result of an unlawful method, act or practice").

BOA's request for the Dismissal of Mr. Kaymark's UTPCPL claims premised on the absence of a monetary payment by Mr. Kaymark toward the illegal foreclosure fees also conflicts with the recent decision of the Pennsylvania Superior Court in <u>Grimes</u>, 66 A.3d 330.  In <u>Grimes</u>, the plaintiff asserted UTPCPL claims based on disputed rental car charges that had been charged to her by the defendant – but which she had not paid.  The Superior Court reversed the trial court's grant of the defendant's motion for judgment on the pleadings and rejected the defendant's argument that the plaintiff had failed to plead an ascertainable loss:

> In what appears to be a classic case of "tail wagging the dog," the trial court granted Enterprise's motion for judgment on the pleadings on the basis Grimes had no ascertainable loss, where Enterprise had stipulated that it will not seek to collect any money from Grimes…
> *Herein, Grimes alleges the same* loss as the plaintiff in Jarzyna [v. Home Properties, L.P., 763 F.Supp.2d 742 (E.D. Pa. 2005)]. Grimes alleges that she has incurred costs and fees associated with asserting her rights and preventing Enterprise from collecting its debt. . . . In our view, this is sufficient to allege an "ascertainable loss" under the UTPCPL. Grimes was not required under the UTPCPL to sit idly by and wait for Enterprise to collect $840.42 from her in order to assert her rights and attempt to stop Enterprise's alleged deceptive trade practices.

<u>Grimes</u>, at 339.  <u>Grimes</u> further held:

> As a result, because Grimes alleged that Enterprise was attempting to collect $840.42 from her through her insurer or credit card company, and she has incurred costs and fees to prevent the same, we conclude Grimes properly pled a claim under the UTPCPL.

<u>Id.</u>, at 339.

## V.   **ALL COUNTS PLED WITH RESPECT TO UDREN ARE VIABLE**

There is no question that an *in rem* foreclosure complaint is governed by the FDCPA in most courts including this one.  See <u>Glazer v. Chase Home Financial, LLC</u>, 704 F.3d 453, 461 (6th Cir. 2013) citing <u>Piper  v. Portnoff Law Assocs.,  Ltd.</u>, 396 F.3d  227 (3d  Cir.  2005).

### A.  Fair Debt Collection Practices Act

In attempting to bless the foreclosure fees, Defendants made two serious errors.  First the Mortgage does not just call for reasonable fees; it also permits only fees incurred for services performed.  Amended Complaint, Exhibit C, ¶¶9(c), 14 and 22.  The fact that fees might be later earned after the foreclosure commenced does not justify charges being levied as already earned at the inception of the action (or here sixty days prior to the inception).  Second, an FNMA fee schedule that allows for a maximum fee of $1,650.00 for the entire foreclosure process does not prove that a $1,650.00 charged at inception of the process (or sixty days prior) was reasonable, or that the fee represents charges incurred for services performed.  Amended Complaint, ¶16.  At best, it indicates that the fee is *per se* unreasonable at the outset of a foreclosure action.  Moreover, this says nothing about whether the fee was incurred.

The FDCPA prohibits debt collectors from using "any false, deceptive or misleading representation or means in connection with the collection of any debt," [FDCPA §1692e], or any "unfair or unconscionable means to collect or attempt to collect any debt," [FDCPA, §1692f].  The loan contracts governing the debt at issue prohibit the debt collector from collecting either fees-for-services that have not been performed or fees-for-services never incurred.  The Foreclosure Complaint at issue never avers that such fees were actually incurred or paid for, nor does it establishes any provision of the loan contract that would override the provision authorizing only incurred fees for services performed.  The charges demanded were alleged to have been earned prior to July 12, 2012, a full sixty days before the foreclosure complaint was even filed.  This demonstrates that the charges demanded represent not work performed prior to July 12, 2012, but a fixed fee charged to principally cover future charges. Such charges are not permitted under the Mortgage.

In short, in its Foreclosure Complaint, Udren asserted that $2,050.00 in attorneys' fees and other assorted foreclosure fees were owed by Mr. Kaymark as of July 12, 2012. Mr. Kaymark, in his Amended Complaint, asserted that by July 12, 2012, sixty days prior to the filing of the foreclosure action, Udren had not performed services amounting $1,650.00 of legal services, nor had work been performed justifying the other $375.00 worth of fees. Mr. Kaymark also asserted that $2,050.00 had not been paid by BOA by July 12, 2012. These are simple matters of fact, and furthermore there is nothing implausible about either allegation.

The non-contractual, and therefore unlawful, foreclosure-related attorneys' fees and costs demanded in the Foreclosure Complaint caused Udren to violate the FDCPA, §1692e because the inflated amount falsely represented the "character, amount or legal status" of Mr. Kaymark's debt, thereby rendering the complaint a "false, deceptive or misleading representation." FDCPA, §1692e(2)(A). The inclusion of such fees also violated the FDCPA, §1692e(10), which prohibits "the use of any false representation or deceptive means to collect or attempt to collect any debt," and the FDCPA, §1692e(5), which prohibits "the threat to take any action that cannot legally be taken."

Udren's attempt to collect unlawful attorneys' fees and costs violated the FDCPA, §1692f because the attempted collection "of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt" constitutes an "unfair or unconscionable means" to collect a debt. FDCPA, §1692f(1).

Nonetheless, Udren attacks the sufficiency of these pleadings employing four theories, which include: (1) that the fees demanded in the Foreclosure Complaint were obviously consistent with the Mortgage; (2) that even if false, the Foreclosure Complaint's falseness was

not material; (3) that a pleading filed in court cannot be the basis of an FDCPA action; and (4) that Mr. Kaymark waived his right to bring any FDCPA action by failing to participate in the FDCPA's debt validation procedure.  Not one of these defenses has merit.

> i.   *Attorneys' Fees Violate the Contract*

Udren first argues that the allegation that the foreclosure-related fees charged were prohibited by the Mortgage contract is meritless.  However, in an apparent attempt to educate the Court, Udren engages in a little frivolity of its own, arguing:

> [W]ithout any legal basis whatsoever, Kaymark asked this Court to validate a theory holding that flat fees in foreclosure cases - - fees **which are administratively mandated by Fannie Mae** - - are *per se* unreasonable and find that the Fannie Mae regulation establishing a fee of $1,650.00 for a contested foreclosure action is unreasonable as a matter of law.  (Footnote omitted)

Document 25, p. 3.

Udren repeatedly tries to shift the question to the reasonableness of fixed fees. This is not even an issue in this case.  Instead, the issue is whether a fixed amount for attorneys' fees, essentially liquidated damages, can be demanded when the contract only provides for reasonable incurred charges for services performed.  The problem with fixed fees here is not that they are *per se* unreasonable in all contexts, but that they are not based on charges incurred for work performed.  The contract permits only incurred charges for work performed.  Amended Complaint, Exhibit C, ¶¶9, 14 and 22.  Other homeowners, at least those, as here, not falling under Act 6 (e.g., flat, fixed or percentage fees), might be free to contract for an attorneys' fee provision in the form of liquidated damages, where charges do not necessarily have to reflect work performed.  Here, the contracting parties did not.  Here, the Parties agreed that only incurred fees would be charged for work performed.

Where homeowners have contractual rights to pay only reasonable, incurred fees for services performed, it is not only not meritless to object to being levied a fixed fee with no specific bearing on the charges incurred or services performed as held in <u>Daniels v. Davis Davis Attorneys, P.C.</u>, No. AR-10-006276, 2011 WL 601699 (C.P. Allegheny Feb. 18, 2011) and the cases cited therein:

> In *Stolicker v. Muller, Muller, Richmond, Harms, Myers and Sgroi, P.C.,* No. 1:04-CV-733, 2005 WL 2180481 (W.D. Mich. Sept. 9, 2005) …the central issue in the case was whether the Muller law firm violated the FDCPA by filing, in state court, a complaint and affidavit in support of a default judgment which included a request for a liquidated attorney fee. The Court ruled in favor of the cardholder; it held that the inclusion of a liquidated sum as attorney fees with the principal debt owed altered the terms of the contract and, thus, violated the FDCPA. The contract which the cardholder signed required that she pay a "reasonable attorney fee, not $776.68 or any other liquidated amount." Id. at *4. The cardholder did not agree to pay a specific percentage contingent fee or a liquidated amount of attorney fees; a reasonable attorney fee cannot be a liquidated sum. The Court, citing other case law, stated that the FDCPA would provide little protection to a debtor if, in agreeing to pay "reasonable collection costs," a debtor was held to have agreed to pay whatever percentage fee a debt collection service happened to charge. *Id.*

The fixed-fee defenses advanced and rejected in <u>Daniels</u> and <u>Stolicker v. Muller, Muller, Richmond, Harms, Myers and Sgroi, P.C.</u>, No. 1:04-CV-733, 2005 WL 2180481 (W.D.Mich. Sept. 9, 2005), are identical to Udren's.  The presence of an agreement that reasonable attorneys' fees can be collected somehow unilaterally bestows on a defendant the legal right to unilaterally determine the amount of its own fees is a defense rejected by <u>Daniels</u> and <u>Stolicker</u>. But here the situation is even more extreme because the limitation is not just premised on the reasonableness of the fees but also directs that fees be actually incurred for services performed.  This is completely inconsistent with being charged, from the outset (or really from sixty days prior to the outset) the absolute maximum permitted for the entire

process.

Udren's intimation that it was only charging the fee that the government forced it to charge is less than honest.  Document 25, p. 3 fn. 2.  The Fannie Mae Schedule, does not address when in the litigation process foreclosure fees and costs can be charged to a homeowner.  It also does not mandate fees, it sets the maximum permissible fee for an entire foreclosure proceeding.  If you accept, as Udren argues, that it was charging only incurred fees for services performed, from the inception of the action, Udren was asserting that it had already earned the maximum reasonable foreclosure fee permitted by Fannie Mae a full sixty days before the proceedings even commenced.

Udren's defense elides the real issue.  Nobody ever disputed that the loan contracts permit the lender to recover reasonable attorneys' fees.  What is important, however, is that the loan contracts only permitted reasonable attorneys' fees that were actually incurred for services actually performed.  Under such a contractual regime, it is not permissible to treat attorneys' fees as liquidated damages.  The amount charged for attorneys' fees can only be determined by the court (Pa.R.Civ.P. 1521), at the end of the foreclosure proceedings, in response to a factual showing establishing the charges that were actually incurred.[6]

It is not likely that Udren had performed services earning the maximum fees possible sixty days prior to the Foreclosure Complaint even being filed.  It is far more plausible to assume, as Udren seems to admit, that the homeowner was charged upfront a set amount (which coincidentally happens to correspond to the absolute maximum that can be charged) without

---

[6] Udren's reliance on <u>Owens v. Howe</u>, 1:04-CV-152, 2004 WL 6070565 (N.D. Ind. Nov. 8, 2004) is similarly misplaced in that it carefully avoids addressing the issue presented.  It is not just that the fees had to be reasonable, but had to additionally be incurred for services actually performed.  The further contention that the FNMA maximum fee is per se reasonable in all cases is preposterous.  This is the maximum fee permitted for any completed case.  Anything above it is per se unreasonable, but this in no way implies that this fee will always be reasonable, just that it is not per se unreasonable.  Where the proceeding is sixty days shy of even being born, it is at a minimum highly doubtful that the fees were actually incurred for services performed.

regard to what BOA had paid for legal services rendered.  If, when all is said and done in a foreclosure proceeding, Udren can demonstrate that it performed at least $1,650.00 in work, it is welcome to its fee.  But charging homeowners upfront is not authorized under the Mortgage or state law here.  In any event, what Mr. Kaymark has pled that the fees demanded in Udren's Foreclosure Complaint did not represent attorneys' fees incurred for services performed, is not only plausible, but overwhelmingly likely.  Accordingly, Mr. Kaymark is entitled to the full presumption of truth under Iqbal/Twombly.

        *ii.    Fee Demands Were Material*

Udren also attempts to attack the proceedings by defending that, even if the pled charges were false, they were not "material" and therefore did not implicate the FDCPA.  Document 25, ps. 11-18.  The basis for this defense is found in a string of court cases cited by Udren.  The seminal case in the line cited by Udren is Hahn v. Triumph Partnerships LLC, 557 F.3d 755, 757 (7th Cir. 2009).  Document 25, p. 15.  In Hahn, a debt collector communication was attacked for the way that it allocated interest with respect to various owners of the loan.  While the itemization was questioned, the overall sum demanded was not.  Judge Easterbrook found that this minor technical flaw was not material in any way:

> A dollar due is a dollar due. Applying an incorrect rate of interest
> would lead to a real injury; reporting interest in one line item rather
> than another (or in two line items) harms no one and, for the
> reasons we have given, may well assist some people.

Hahn, at 757.  Mr. Kaymark does not dispute this holding, but it has no application here.  Indeed, "A dollar due is a dollar due," but what is at issue here is that Udren has asserted an amount due that, Mr. Kaymark avers, is not in fact due.  This is categorically different from the technical violations cited in the materiality cases cited by Udren.  The amount of the debt demanded, where it varies from what is actually owed, is the very archetype of material violation.

iii.     *Court Pleadings Can Serve as the Basis for an FDCPA Action*

Udren also attacks the legal sufficiency of Mr. Kaymark's FDCPA count against it, arguing based largely on a superseded line of cases, that a pleading in court like a Foreclosure Complaint, cannot form the basis of a FDCPA action as a matter of law.  Document 25, ps. 18-21.  This is not the law of our Supreme Court or the Third Circuit.  In Heintz v. Jenkins, 514 U.S. 219 (1995), the Supreme Court considered whether the FDCPA applies to a lawyer who regularly collect consumer debts through litigation.  As summarized in Daniels:

> The Court ruled that the FDCPA applies to litigating activities of lawyers for "two rather strong reasons." *Id* at 1490. First, in ordinary English, a lawyer who regularly tries to obtain payment of consumer debts through legal proceedings comes within the definition of a. *debt collector.* Second, Congress repealed the exemption for lawyers in 1986. This repeal expressed a Congressional intent that lawyers be subject to the Act when they meet the *debt collector definition.  Id* at 1491.

Id.  See also Sayyed v. Wolpoff & Abramson, 485 F.3d 226, 231 (4th Cir. 2007) and Gallagher v. Gurstel, Staloch &  Chargo, P.A., 645 F.Supp.2d 795, 805 (D. Minn. 2009).

That the FDCPA does apply to false statements in a formal complaint was determined by Donohue v. Quick Collect, Inc., 592 F.3d 1027, 1031-1032 (9th Cir. 2010).

> While the communication at issue in Heintz was a letter, not a legal pleading as here, the logic of Heintz controls our analysis. Quick Collect caused Donohue to be served with the Complaint to further Quick Collect's effort to collect the debt through litigation.

This holding is consistent with the rulings of other courts of appeals, including this Circuit (but excluding a District in the Eleventh Circuit).  See, e.g., Piper  v. Portnoff Law Assocs., Ltd., 396 F.3d  227, 232 (3d  Cir.  2005).[7]  A discussion of this issue can be found in Glazer.

---

[7] Udren misconstrues Gabriele v. Am. Home Mortgage Servicing, Inc., 503 F. App'x 89 (2nd Cir. 2012), which itself did not overwrite Goldman v. Cohen, 445 F.3d 152 (2d Cir. 2006).  First, Gabriele clearly affirms that a legal pleading can implicate the FDCPA.  Document 25, ps. 12-13.  The problem with the cause of action in Gabriele was

The case law supplied by Udren at best only represents a small minority of cases issued before a number of more significant and recent court of appeals opinions.

Udren further relies on "a substantial body of law, emanating from" a series of FTC commentaries from 1989 which took the position that a formal pleading is not an FDCPA communication in connection with the collection of a debt. Document 25, p. 12. Of course whatever the FTC said in 1989 is superseded by Heintz in 1995 and the amendment of the FDCPA by Congress in 1996. By taking formal pleadings out of the ambit of §1692g, Congress made clear that it regarded formal pleadings as otherwise implicated by the FDCPA. Thus the FTC commentary, and whatever case law it inspired has all been superseded by statute.

Finally, Udren makes much of the fact that Mr. Kaymark was represented in the state court proceedings. As the recent case of Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA, 559 U.S. 573, (2010) makes clear, this has no bearing on the viability of an FDCPA cause of action. There is no safe harbor in the FDCPA for debt collectors to abuse consumers represented by counsel.

> iv.  *Failure to Participate in the Debt Validation Procedure Does Not Constitute a Waiver of All Future FDCPA Rights*

Udren advances the defense that, after being provided with a debt validation letter and failing to avail himself of the debt validation procedure set forth in §1692g, Mr. Kaymark is now foreclosed from pursuing a claim under the FDCPA premised on the invalidity of the debt. Document 25, ps. 18-21.

Here there are a number of deficiencies. There is no validation of debt notice in the record. See FDCPA, §1692. Contrast Document 25, p. 19, referring to page four of the Act 91 Notice, which contains a demand for $7,084.46. A Validation of Debt Notice looks quite

---

not that it was premised on a formal pleading, but that the misrepresentations it attacked were too narrow and technical to materially mislead anyone. Id.

different from an Act 91 notice and must contain the contains required by FDCPA, §1692(g)(a), which BOA's purported Act 91 Notice does not.  Moreover, it also cannot be assumed by the debt collector that the debtor is also bound by its own entitled assumption that the debt is valid.  See Diaz v. Residence Credit Solutions Inc., No. 12-cv-3781, 2013 WL 1820948, *9 (E.D.N.Y. April 29, 2013).  In fact, it is a FDCPA violation for the debt collector to, in its Validation of Debt notice, exclude that is only the assumption of the debt collector (not the failure of the debtor to respond) that is at issue. Id.  Second, the law cited is inconsistent with the FDCPA.  The FDCPA provides assurances that failure to participate will not be a concession of the validity of the debt.

> (c) Admission of liability
> The failure of a consumer to dispute the validity of a debt under this section may not be construed by any court as an admission of liability by the consumer.

FDCPA, §1692g.  Third, not a single case cited by Udren represents binding precedent, or even an appellate opinion, and contrary opinions abound, supported by more compelling reasoning.  See, e.g., Velazquez v. NCO Fin. Sys., Inc., CIV.A. 2:11-CV-00263, 2011 WL 2135633 (E.D. Pa. May 31, 2011) and Brown v. Palisades Collection, LLC, 1:11-CV-00445-JMS, 2011 WL 2532909 (S.D. Ind. June 24, 2011).

Finally, even if there was such a debt validation letter, and such law existed, it would not be applicable here since the FDCPA, §1692g process was overshadowed and obviated by the fact that the so-called debt validation notice was sent in connection with the filing of the Foreclosure Complaint.   The statute specifically enjoins the debt collector from taking any action that overshadows the debt validation notice within the thirty day period:

> Any collection activities and communication during the 30-day period may not overshadow or be inconsistent with the disclosure

> of the consumer's right to dispute the debt or request the name and
> address of the original creditor.

FDCPA, §1692g (notes).  Courts have held that taking legal action within the thirty day period, particularly without a clear explanation that debt validation rights are un-effected by the suit, overshadows like debt validation notices.  _Ellis v. Solomon & Solomon, P.C._, 591 F.3d 130 (2d Cir. 2010).  _See also_ _Register v. Reiner, Reiner & Bendett, PC_, 488 F. Supp. 2d 143 (D. Conn. 2007) (Notice that consumer had only thirty days to cure default overshadowed debt validation notice providing thirty days to cure the debt.)

### B.  Unfair Trade Practices and Consumer Protection Law

Udren's attacks on the sufficiency of Mr. Kaymark's UTPCPL pleading fall under three theories; that law firms are immune from liability under the _Beyers v. Richmond_, 937 A.2d 1082 (Pa. 2007) decision that Mr. Kaymark failed to establish justifiable reliance, and that Mr. Kaymark failed to plead any ascertainable loss.  The latter two defenses are indistinguishable from those advanced by BOA and already addressed and negated above.  Mr. Kaymark hereby incorporates the BOA-related defenses above.  As to Udren's defense under _Beyers_, it is without merit.[8]

Udren effectively argues that "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding," which would normally constitute a violation of the UTPCPL, nevertheless falls outside of the scope of the UTPCPL if found in a foreclosure complaint.  Document 25, ps. 12-14.  The basis of this determination is that the conduct of an attorney pursuant to the practice of law is under the exclusive jurisdiction of the Supreme Court and governed by the rules of professional conduct.  In reaching this determination Udren relies

---

[8] This very issue is pending before the Pennsylvania Superior Court _Glover v Udren_, No. 938 WDA 2012 (Pa.Super. 2012).

heavily on <u>Beyers</u>.  However, even a casual reading of <u>Beyers</u> reveals that this holding is limited to professional misconduct, specifically the conduct of an attorney in the representation of a client.  The court was careful to distinguish attorney/third party interactions, particularly with respect to the collection of debts, from its holding.  Here, Mr. Kaymark makes no claim with regard to Udren's behavior with respect to its client.  Rather, Mr. Kaymark's claim is based entirely upon Udren's interactions with third parties, specifically debt collection activities; i.e., the very activities the <u>Beyers</u> court carefully distinguished from its holdings in that case.

In <u>Beyers</u>, the Pennsylvania Supreme Court considered whether the UTPCPL governed attorney professional misconduct, in particular, an accusation of the conversion of client funds. The court adopted the view that the UTPCPL, as a statutory matter, was inapplicable to professional services.

But while the Court held that the UTPCPL was inapplicable to the provision of professional services, it also held that, where a professional service provider was engaged in activities in trade or commerce outside of her profession, the UTPCPL may, nonetheless, apply.

> But in *Daniels v. Baritz,* 2003 WL 21027238, 2003 U.S. Dist. Lexis 7707 (E.D.Pa.2003), the District Court distinguished *Jackson.* In *Daniels,* the defendant attorneys were debt collectors within the meaning of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §1692, and the court held "[a]ttorneys who regularly engage in debt collection practices, *apart from their legal representation,* are covered under the FDCPA." *Daniels,* at *4, 2003 U.S. Dist. Lexis 7707 at *11-12 (emphasis supplied). The UTPCPL was interpreted to apply to debt collection as an act in trade or commerce. *Id.* at *5, 2003 U.S. Dist. Lexis 7707 at *14. Similarly, the Commonwealth Court addressed applicability of the UTPCPL in the context of physicians' fraudulent billing practices. In *Commonwealth v. Cole,* 709 A.2d 994, 997 (Pa.Commw.1998), *appeal denied,* 558 Pa. 611, 736 A.2d 606 (1999), the court held that a physician's attempt to collect outstanding bills from patients after the statute of limitations had run was violative of the UTPCPL. Dr. Cole characterized his activities as debt collection and he was engaged in debt collection practices in violation of 37

> Pa.Code §§303.3(3) and (18) (Debt Collection Regulations). These
> cases are distinguishable from the decisions involving professional
> misconduct by physicians

Beyers, at 1089.   Having distinguished professional misconduct from "acts in trade or commerce" the Beyers court ultimately held that, on the facts of that case, where the complaint was based on a violation of the attorney's duty to his client, and where the rules of professional conduct thoroughly covered the terrain, subjecting the attorney to the UTPCPL would interfere with the court's unique constitutional authority to govern attorney professional misconduct.[9]  To the extent that the constitutional holding represents precedent in this present case, it should be noted that the holding was expressed in as narrow terms as possible, and tied specifically to the facts of that case where the issue was limited to professional misconduct with respect to an Attorney's representation of a client. Beyers, at 1092-1093.

Thus, far from giving attorneys a complete exemption with respect to the UTPCPL, the Beyers court limited its holding to professional misconduct involving attorney client relations, a field over which the Rules of Professional Conduct deals exhaustively.  Here, the Rules of Professional Conduct are largely silent.  Here, the issue is a debt collecting attorney advancing the collection of its own fees against a third party.  This is not an attorney-client matter, but a matter in trade or commerce like any garden variety debt collection.  Where this is the case, there is no bar on the applicability of the UTPCPL.

---

[9] The constitutional part of the ruling was not adopted by a majority of the court. The concurrence, therefore, which adopted only the narrower holding on statutory grounds, is the only holding entitled to stare decisis.

VI.     __CONCLUSION__

Wherefore, for the reasons stated above, BOA's and Udren's Motions to Dismiss (Documents 24-27) should be denied.

<div style="margin-left:50%">

Respectfully Submitted,
MICHAEL P. MALAKOFF, P.C.
*/s/Michael P. Malakoff*
Michael P. Malakoff, Esquire
Pennsylvania Attorney I.D. #11048
Suite 200, The Frick Building
Pittsburgh, PA 15219
Telephone: (412) 281-4217
Facsimile:  (412) 281-3262
malakoff@mpmalakoff.com
*Attorneys for Named Plaintiff Dale A. Kaymark, individually and on behalf of other similarly situated former and current homeowners in Pennsylvania*

</div>

**CERTIFICATE OF SERVICE**

I hereby certify that on the **12th** day of **July**, **2013**, a true and correct copy of the foregoing **Response in Opposition to Defendants' Motions to Dismiss** was served upon the following parties of interest via the Court's Electronic Filing System:

Thomas L. Allen, Esquire
Nellie E. Hestin, Esquire
REED SMITH, LLP
225 Fifth Avenue
Pittsburgh, PA 15222

Jonathan J. Bart, Esquire
WILENTZ GOLDMAN & SPITZER, PA
Two Penn Center, Suite 910
Philadelphia, PA 19102

*/s/Michael P. Malakoff*
Michael P. Malakoff, Esquire